Antonio GARCIA–DORANTES,
Petitioner,

v.

Millicent WARREN, Respondent.

Case No. 05–10172.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 9, 2013.

See also 769 F.Supp.2d 1092.

Antonio Garcia–Dorantes, Lapeer, MI, pro se.

Brad H. Beaver, Michigan Department of Attorney General, Lansing, MI, for Respondent.

***OPINION AND ORDER ADOPTING IN PART REPORT AND RECOMMENDATION, OVERRULING IN PART RESPONDENT'S OBJECTIONS, AND GRANTING PETITION FOR WRIT OF HABEAS CORPUS***

DAVID M. LAWSON, District Judge.

Petitioner Antonio Garcia–Dorantes, presently in the custody of the Michigan department of corrections, filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his convictions and sentences for second-degree murder and assault with intent to do great bodily harm less than murder. Counsel subsequently was appointed and filed an amended petition, which contained seven claims, including improper admission of his pretrial statements, which he alleged were involuntary and taken in violation of *Miranda v. Arizona;* violation of his rights under the Confrontation Clause; denial of a fair trial due to prosecutorial misconduct; ineffective assistance of trial and appellate counsel; denial of due process and equal protection rights through the systematic exclusion of minority jurors in Kent county; and violation his of Sixth Amendment right to a jury trial when the judge calculated his sentencing guidelines on the basis of judge-found facts.

On March 8, 2011, the Court filed an opinion and order denying all claims in the petition except claim VI, relating to the exclusion of minority jurors in Kent County. The Court referred the case to Magistrate Judge Charles E. Binder to conduct

an evidentiary hearing and expand the record as to the ethnic composition of the jury venire in the defendant's case. The hearing was held on August 25, 2011, and the parties afterwards filed supplemental briefs on the question whether the petitioner's sixth claim should be allowed to proceed. On January 5, 2012, the magistrate judge issued a report finding that (1) the petitioner's fair cross-section claim was subject to procedural default, because it was denied by the state court of appeals on the basis that the petitioner failed to object to the composition of the panel before the jury was sworn; (2) the petitioner had shown cause for his failure to object, because he could not have known of the computer glitch which led to the systematic exclusion of minority jurors from the venire; and (3) the petitioner did not need to show actual prejudice, because prejudice should be presumed in the case of an alleged structural error, .such as a fair cross-section claim. The magistrate judge recommended that the petitioner's fair cross-section claim be allowed to proceed. Addressing the merits, the magistrate judge determined that the petitioner presented a *prima facie* case of underrepresentation in violation of the Sixth Amendment's fair cross-section requirement and the state offered no compelling justification. The magistrate judge, therefore, recommended conditionally granting the petition for writ of habeas corpus. The respondent filed timely objections, and the petitioner filed a response to the objections.

## I.

The respondent filed four objections to the report and recommendation. First, she says the magistrate judge erred in finding cause to excuse the procedural default. Second, she argues that the magistrate judge was mistaken in concluding that prejudice can be presumed when as-

sessing the procedural default defense, even when the error is structural. Third, the respondent believes that the magistrate judge did not assess the evidence of racial disparity properly, and that the petitioner did not demonstrate that the computer glitch caused any such disparity. Fourth, the respondent asserts that *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), were decided wrongly, and she asserts that the Sixth Amendment does not guarantee the right to a jury selected from a fair cross-section of the community.

On June 28, 2012, the United States Court of Appeals for the Sixth Circuit decided a trio of appeals from decisions on habeas petitions raising fair cross-section claims based on the same Kent County juror selection computer glitch at issue in this case. *Ambrose v. Booker*, 684 F.3d 638 (6th Cir.2012), *cert. denied* —— U.S. ——, 133 S.Ct. 993, 184 L.Ed.2d 771 (2013) (also deciding *Carter v. Lafler* and *Wellborn v. Berghuis*). In each case the respondents asserted a procedural default defense based on the petitioners' failure to make a timely objection to the composition of the jury panel. The Sixth Circuit held that the petitioners in the context of the particular jury selection glitch at issue had established cause for the procedural default, because "where the underrepresentation is as obscure as the one in this case ... a failure to object must be excused." *Ambrose*, 684 F.3d at 649. However, the court also held that to excuse a procedural default, a petitioner "must show that he was actually prejudiced regardless of the nature of the underlying constitutional claim." *Id.* at 651. Demonstrating actual prejudice requires a showing that "there was a reasonable probability that 'a properly selected jury [would] have been less likely to convict.'" *Id.* at 652 (quoting

*Hollis v. Davis,* 941 F.2d 1471, 1482 (11th Cir.1991) (alteration in original)).

## A.

The *Ambrose* decision addresses at least two of the issues the respondent raises in her four objections to Judge Binder's report. The first objection is that the magistrate judge erred in finding that cause for the procedural default was established. *Ambrose* confirms the correctness of the magistrate judge's finding on that issue, and the respondent's objection must be overruled.

## B.

The respondent's second objection—that prejudice cannot be presumed in the procedural default context—has merit. The *Ambrose* court held that the petitioner must show actual prejudice. Neither party addressed actual prejudice in their briefing. In fact, the attorney general apparently confused this case with another, contending that the petitioner was sentenced in state court for armed robbery and possession of a firearm. (This is a murder case involving a knife.) Therefore, on July 23, 2012, the Court ordered the parties to submit supplemental briefs on the issue of actual prejudice, and instructed the parties that "[t]he briefs should include references to specific parts of the record that either highlight or undermine the strength of the prosecution's case." The parties filed timely briefs in response to the Court's order.

The petitioner argues that he did suffer actual prejudice as a result of the under-representation of African–American jurors in his venire, because (1) the evidence was "remarkably close on the only disputed issue at trial—[his] state of mind during a street fight"; (2) "the trial involved issues to which racial minorities are likely to be uniquely sensitive, including the threat of gang violence in unfamiliar urban neighborhoods"; and (3) "reliable scientific evidence shows that in virtually *all* cases, increased minority participation on juries decreases the likelihood of conviction." Pet'r's Supp. Brief at 2 (emphasis in original).

The respondent argues that the petitioner cannot establish that actual prejudice occurred because (1) "solid eyewitness testimony identified Petitioner as the man who attacked Jose Gomez and the person who stabbed and injured Manuel Garcia"; (2) "physical and scientific evidence linking Petitioner to the crimes supported the identification testimony and undermined portions of Petitioner's multiple versions of events"; (3) "Petitioner's own contradictory statements and trial testimony, and the failure of the other defense witnesses to provide any support for the claim that Petitioner killed in self-defense substantially weakened the defense"; and (4) "there were no racial or ethnic undertones of any kind in this case such that a jury selected in the absence of the Kent County computer glitch ... would have acquitted or found Petitioner guilty of lesser offenses."

The Sixth Circuit has explained that "[t]he most important aspect to the [prejudice] inquiry is the strength of the case against the defendant." *Ambrose,* 684 F.3d at 652. One possibility is that the "transcript could show a case against petitioner so strong, and defense so weak, that a court would consider it highly improbable that an unbiased jury could acquit." *Ibid.* (quotation marks and alterations omitted). However, in a close case, where the "jury's verdict rested on a narrow ground," the .petitioner may be able to show "a reasonable probability that ... the result of the proceeding would have been different," if the case had been presented to an unbiased jury. *See Foster v.*

*Wolfenbarger,* 687 F.3d 702, 710 (6th Cir. 2012). In addition to the strength of the prosecution's case, the Court may also consider "the race of the jurors, defendant, and victim," where relevant. *Ambrose,* 684 F.3d at 652 n. 4. If the facts and circumstances of the case suggest that "[comparing] the result reached by an all white jury, selected by systematic exclusion of blacks, with the result which would have been reached by a racially mixed jury, [the Court] would have greater confidence in the latter outcome, finding much less probability that racial bias had affected it," then this also may support a finding that actual prejudice resulted from the systematic exclusion of jurors of a particular race from the venire. *Ibid.* (citing *Huffman v. Wainwright,* 651 F.2d 347, 350 (5th Cir.1981)). The actual prejudice standard that the Court must apply is the same standard that governs ineffective assistance of counsel claims under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Ambrose,* 684 F.3d at 652.

This Court discussed the background facts and procedural history of the case at length in its prior opinion and order. However, the factual context of the case is worth repeating here due to the weight accorded to "the strength of the prosecution's case" in the prejudice inquiry.

The petitioner was involved in a fight and stabbed two people, one fatally, in Grand Rapids, Michigan in the early morning hours of October 22, 2000. He was charged with open murder and assault with intent to do great bodily harm. Following a jury trial, he was convicted of the lesser crime of second-degree murder and assault with intent to do great bodily harm less than murder.

Jose Gomez, the homicide victim, died from a single stab wound to his upper chest, just beneath his collar bone. A 3–

3/8 inch stab wound penetrated his left lung and punctured his pulmonary artery. The medical examiner determined that Gomez had been intoxicated at the time of the fight, with a blood alcohol level of .31 percent. Although the medical examiner testified that most persons would be comatose with a blood alcohol level above .30 percent, he could not discount the possibility that Gomez could have attacked someone in a fight situation if he was a habitual drinker.

Manuel Garcia was the assault victim. He worked for Gomez. The two men had been drinking that night until about 4:00 a.m. They arrived at Gomez's house with a third companion, Gonzalo Ramirez–Toledo. When they drove up, the petitioner's truck was parked across the street. The petitioner testified that he thought the men were part of a gang and that they had tried to force him off the road during an earlier encounter that night.

The petitioner was standing outside of his truck. Gomez got out of Garcia's truck and walked toward him, stating that he "did not want any problems"; he told the petitioner that he should leave or Gomez would call the police. Garcia and Ramirez–Toledo then got out of Garcia's truck and approached the petitioner. Two other persons had also exited the petitioner's truck. Ramirez–Toledo said the petitioner had his hand behind his back when he first saw him standing beside his truck. Ramirez–Toledo said he did not see what occurred between the petitioner and Gomez, nor did he see a knife in the petitioner's hand.

Garcia testified that when Gomez asked the men to leave, the petitioner replied "And if I don't want to?" and punched Gomez in the face. Gomez fell down, got up again and "threw himself" at the petitioner. Garcia acknowledged that he did not see which man started the fight. As

Garcia attempted to break the fight up, he felt a cramp in his leg and later learned that he had been stabbed in the buttock. Garcia was also stabbed in the back of his neck. Garcia testified that the petitioner then threatened him with a bottle. Ramirez–Toledo testified that Gomez asked him to call the police. As Ramirez–Toledo did so, one of the petitioner's friends hit him in the head with a bottle. Ramirez–Toledo then heard Gomez say, "Let's go." Ramirez–Toledo observed petitioner get into his truck and leave the area, squealing his tires as he left. Gomez, Garcia, and Ramirez–Toledo got into Garcia's truck. Once inside, Garcia noticed that Gomez was very bloody. Garcia drove Gomez to the hospital. The petitioner and his companions had left the area already.

While driving Gomez to the hospital, Garcia passed the petitioner's truck when it stopped at a stop sign. When Garcia stopped at a red light, the petitioner drove up and crashed into the rear of Garcia's truck. Garcia continued driving but claimed that the petitioner crashed into his pickup truck two more times. Garcia drove to Gomez's brother's house, where they called the police and an ambulance.

Police responded to a dispatch of a shooting to an address on Rose Street. Upon arrival, emergency medical personnel informed the police that it had actually been a stabbing and Gomez had died. Officers then received a dispatch for a "hit and run" and went to the petitioner's house. The police were informed that the petitioner had been involved in a hit and run accident. They noticed damage to the front of the petitioner's vehicle. They arrested the petitioner and his friend named Christian Diaz.

Police Officer John Riley testified that he interviewed the petitioner in the early morning hours of October 22, 2000. Riley ascertained that the petitioner spoke very little English. Riley testified that he was "pretty fluent" in Spanish, and he read the petitioner his *Miranda* rights in Spanish. Thereafter, the petitioner made two verbal statements. In his first statement, he blamed his wife for the truck crash and resulting damage. Later that afternoon, he made a second statement in which he admitted to having been involved in a fight. The petitioner told the police that he thought that Gomez and his friends were "gangbangers" who had threatened him earlier.

Detective Gregory Griffin was present when both statements were made. He testified that although he found no evidence that any of the persons involved in this altercation were gang members, he could not rule out that Gomez was a gang member.

The petitioner testified on his own behalf at trial, explaining that he was celebrating his daughter's birthday on October 21, 2000. He and his friends later left the party to go to his girlfriend's house, with whom he was having an extramarital affair. The petitioner parked in front of the house and went to the door. When there was no answer, he returned to his truck. It was then that he saw Garcia's truck arrive. The petitioner claimed that Garcia had tried to ram him with his truck earlier that day and had tried to run the petitioner off the road. He thought Gomez, Garcia, and Toledo were gang members. According to the petitioner, a person from the victim's truck provoked the fight. When others joined in, he became scared and pulled a knife, thrusting it once as a person lunged at him. That man left and his friends followed. The petitioner claimed that when he went to drive away, the men pulled their truck in front of him and "locked" their brakes, causing the petitioner's vehicle to collide with their truck.

The petitioner went home and told his wife about the accident. He said his wife volunteered to tell the police that she had been driving because the petitioner was intoxicated at the time. The petitioner denied intending to harm anyone.

The petitioner's common-law wife, Anayeli Castellanos, testified that the petitioner woke her in the early morning hours of October 22, 2000 and informed her that someone had crashed into his truck. The petitioner demanded that she call the police to report the incident. The police arrived and arrested the petitioner. Castellanos admitted that she suggested that the petitioner inform the police that she had been driving because petitioner appeared scared and had been drinking.

The petitioner argued that he acted in self-defense, and that the crime was no worse than manslaughter. The jury found him guilty of the lesser offense of second-degree murder in Gomez's death and assault with intent to do great bodily harm less than murder as to Garcia. The petitioner concedes that he stabbed and killed Jose Gomez during a street fight. But he says that a close question was presented as to his state of mind and therefore whether his conduct amounted to first-degree murder, second-degree murder, voluntary manslaughter, or lawful self-defense. He reasons that because the case was close, a properly constituted jury would have been less likely to convict.

Based on the record evidence, it is not reasonable to find that the "case against petitioner so strong, and defense so weak, that a court would consider it highly improbable that an unbiased jury could acquit." *Ambrose*, 684 F.3d at 652. A strong contrast can be drawn between the evidence in this case and that in other cases where jury irregularities were not found to cause prejudice. *See, e.g., Francois v. Wainwright*, 741 F.2d 1275 (11th

Cir.1984) (defendant attempted to execute six robbery witnesses, killing five, admitted to a prosecution witness that he had done the shooting, and was positively identified by the surviving victim); *Godfrey v. Kemp*, 836 F.2d 1557, 1570 (11th Cir.1988) (the defendant "was found at the scene of the killings, it was his telephone call that led the police there, and he never denied having committed the murders")

In contrast with the cases discussed above, the Sixth Circuit has found prejudice where the evidence was more equivocal as to a central element of the crime, such as the identity of the killer, as in *Foster v. Wolfenbarger*, 687 F.3d 702, 709 (6th Cir.2012):

> [T]he only witness who could identify [defendant] at the scene of the crime .... told the police that the assailant was 5′6″ or 5′7″ and weighed 180 pounds, while [defendant] is 6′0″ and approximately 240 pounds. In addition, while [the witness] testified at trial that the assailant was wearing a green jacket of the same type as the man she saw [earlier], she was successfully impeached with her preliminary hearing testimony that the assailant was wearing a blue jacket. By any standard this is a weak identification. Moreover, [this] identification is the only direct link of [the defendant] to the crime—there was no forensic evidence recovered at the scene.

687 F.3d at 709. The Sixth Circuit has emphasized that in evaluating whether prejudice occurred, "[a]lthough the circumstantial evidence alone might have led to a conviction, the question before us is not one of the sufficiency of the evidence, but of undermining our confidence in the reliability of the result. In addition, witnesses are not always believed." *Richey v. Bradshaw*, 498 F.3d 344, 364 (6th Cir.2007).

In *Phillips v. Woodford*, 267 F.3d 966 (9th Cir.2001), the Ninth Circuit confront-

ed a case similar to the present matter, where the defendant did not challenge the fact that he killed the victim, but only challenged the specific element of mental state as an aggravating factor at the penalty phase of the trial. The court of appeals summarized the facts of the case:

> [Defendant] got out of the Toyota and spoke for some time to [the first victim,] Rose[,] and [the second victim,] Bartulis[,] through the Ranchero driver-side window. At some point, [the witness] heard shots fired and as a result, she looked up and saw [defendant] holding a gun. [Defendant] took Rose's and Bartulis's wallets which contained a total of $120 to $150 and brought them back to the car. He then set the Ranchero on fire using gasoline he obtained from the trunk of the Toyota. Rose, who was still alive, jumped out of the burning Ranchero. Upon realizing that Rose was still alive, [defendant] drove the Toyota into Rose and hit him, also cracking the Toyota's windshield. Upon first finding the wallets and again while driving away from the shootings, [defendant] lamented not finding more money than he did.
>
> [Defendant] alleges that Bartulis was killed in a shoot-out. According to [defendant's] declaration, he fired his weapon at Rose and Bartulis only after "he heard the 'click' of a hammer going back on a revolver"; he also declares that he "found a large revolver in Rose's hand after the shooting." [Defendant] contends that Bartulis was killed not by his bullet but by Rose's, and that he will be able to establish as much if given the opportunity to develop facts at an evidentiary hearing.

*Phillips*, 267 F.3d at 972. The court concluded that:

> [I]f a "shoot-out" defense had been presented at trial, the jury might well have found that [defendant] did not form the intent to steal until after the killing, thus necessitating the conclusion that special circumstance 190.2(c)(3)(i) did not apply to [him]. In such case, [defendant] could not have been sentenced to death.... [W]e conclude that [the defendant] has raised a colorable claim of prejudice, a sufficient showing to entitle him to an evidentiary hearing on his ineffective assistance of counsel claim.

*Id.* at 983.

■ There is no question that the trial record here discloses sufficient evidence on which a jury could have found that Garcia–Dorantes acted with malice and therefore reasonably could have found him guilty of second-degree murder. But "the question before [this Court] is not one of the sufficiency of the evidence." *Richey*, 498 F.3d at 364. The evidence of the petitioner's state of mind—his intent—was hardly overwhelming. Even if the jury accepted as true Ramirez–Toledo's testimony that the petitioner had his hand behind his back when Gomez and his companions stepped out of their truck, it could still reject the inference that the petitioner was hiding his knife behind his back and accept the petitioner's contention that he only took his knife out after Gomez and his companions "jumped" at the petitioner. The forensic evidence that the penetrating wound in Gomez's chest would have required a "strong" thrust is consistent with the petitioner's admission that he "thrusted" the knife in order to ward off an attack, and the jury might still believe that he did so blindly, or with an intent only to ward off an assault rather than to kill. Moreover, all of the witnesses agreed that the petitioner and his companions fled the scene first, indicating that he did not press the attack when Gomez and his companions retreated. The petitioner's testimony is questionable given his contradictory state-

ments to police about the circumstances of his car accident and the origin of the blood recovered from his shoes and clothes, but if the jury nevertheless accepted his version of events, then it reasonably could have concluded that he committed manslaughter only or that he acted in self-defense.

The petitioner has presented evidence from an expert social psychologist that juries with more minority members are less likely to convict regardless of the crime, and he argues that this opinion supports the conclusion that there is a reasonable probability that a properly selected jury would have been less likely to convict. However, even if the Court credits the petitioner's showing on this point as true, it is irrelevant to the question of actual prejudice. A properly selected jury could well have been all white, with no minority members at all. The petitioner is not entitled to a more lenient jury, or a jury panel with a particular racial balance—just one that has been selected through a constitutionally sound process, regardless of the race of the members. *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The question is not whether the petitioner missed his chance to stand trial before a more merciful jury panel or a panel with a particular racial balance, but rather whether there is a reasonable probability that a different jury would have reached a different result.

However, the petitioner has raised a credible claim that on the facts of this case, "[a] mixed-race jury might clearly have a special perception." Because African–American and Hispanic jurors from more urban areas would be more likely to have encountered gang violence than suburban white jurors, they may have better understood the situation that the petitioner faced in a 4:00 a.m. confrontation with a

person who he thought was a gang member, and a jury selected from a fair cross-section of the Kent County community therefore might have had a different perception of and reached different conclusions about the state of mind that the petitioner had during the resulting street fight. As the petitioner points out, none of the witnesses—including petitioner—testified to having a precise memory of what happened at the moment Jose Gomez was stabbed. Because the evidence on the petitioner's state of mind reasonably allowed for competing inferences, the subjective perceptions, life experience, and common sense of the jurors, as shaped by their individual racial and cultural backgrounds, would carry considerable weight in deciding what precise intent the defendant had at the crucial moment. That observation applies with equal force to the question whether the petitioner intended to inflict great bodily harm when he stabbed Manuel Garcia.

Based on the facts and circumstances of the case, when comparing the result reached by a jury "selected by systematic exclusion of blacks, with the result which would have been reached by a racially mixed jury, [the Court] would have greater confidence in the latter outcome, finding much less probability that racial bias had affected it." *Ambrose*, 684 F.3d at 652 n. 4.

The Court concludes that there is a reasonable probability that a fairly selected jury would have been less likely to convict the petitioner, and the record does not disclose "a case against petitioner so strong, and defense so weak," as to make it "highly improbable that an unbiased jury could acquit." The petitioner therefore has shown that he suffered actual prejudice as a result of the Kent County jury selection glitch that systematically excluded minority jurors from his venire. It

is appropriate, therefore, to address the merits of the petitioner's fair cross-section claim.

### C.

The magistrate judge concluded that the petitioner established a *prima facie* case that minorities were underrepresented on the petitioner's jury pool in violation of the Sixth Amendment's fair cross-section requirement. The respondent objected to the magistrate judge's consideration of the evidence presented on this point and his application of Sixth Circuit law.

### 1.

■ The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996), require federal habeas courts to give great deference to state court decisions on the merits of constitutional questions in criminal cases. As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1, 2); *Franklin v. Francis,* 144 F.3d 429, 433 (6th Cir.1998). Also, the Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold,* 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of

historical fact unless they are clearly erroneous").

This narrow standard of review does not apply when the state court does not address a constitutional claim on the merits. The Sixth Circuit has held that a "state court may have various reasons for denying an application for leave to appeal 'for lack of merit in the grounds presented,'" but a federal court cannot "discern from that language alone whether that decision was based on the merits of the case." *Dorn v. Lafler,* 601 F.3d 439, 443 (6th Cir.2010). Where the federal court is unable to "conclude that it was an 'adjudication on the merits' pursuant to 28 U.S.C. § 2254(d)," as here, a more conventional standard of review is appropriate. *Ibid.* The approach espoused by *Dorn* was called into doubt by *Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), which held that "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" 131 S.Ct. at 785. The Supreme Court stated that when a claim is presented for adjudication to a state court, there is a presumption "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 784–85. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

Regardless of the continued validity of *Dorn v. Lafler,* the presumption has been overcome in this case. The state court expressly declined to reach the merits of the fair representation claim due to lack of objection to the venire in the trial court. The procedural posture of this case is the same as the court of appeals found in *Ambrose v. Booker.* There, as here, "it is evident that the state courts rejected peti-

tioners' fair cross-section claims on procedural grounds, based on the failure to object to the jury panel at trial. For this reason, AEDPA deference does not apply and the court reviews legal conclusions de novo and findings of fact for clear error." *Ambrose,* 684 F.3d at 644–45 (citing *Dyer v. Bowlen,* 465 F.3d 280, 283–84 (6th Cir. 2006)).

2.

The Sixth Amendment "secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith,* 559 U.S. 314, 319, 130 S.Ct. 1382, 176 L.Ed.2d 249 (2010) (citing *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)). In order to establish a *prima facie* violation of the fair cross section requirement, the petitioner must prove three elements: "(1) that the group alleged to have been excluded is a 'distinctive group' in the community; (2) that the representation of that group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to the systematic exclusion of the group in the jury selection process." *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). If the petitioner makes out a *prima facie* violation, then the burden shifts to the State to show a "significant state interest [that is] manifestly and primarily advanced by those aspects of the jury-selection systems, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.* at 367–68, 99 S.Ct. 664.

The magistrate judge concluded that the evidence established that minorities were systematically excluded from Kent County's jury pool and were underrepresented. A review of that evidence is appropriate here.

At the evidentiary hearing in this case held on August 25, 2011, the parties stipulated to the admission of the following evidence that was admitted at prior hearings: (1) the transcript of the evidentiary hearing held on October 26, 2009 in an earlier case dealing with the same Kent County jury irregularity, *Parks v. Warren,* No. 05–10036 (E.D.Mich.), which contained the testimony of Wayne Bentley, a Grand Rapids Public Schools teacher who since 1998 has been a member of the Kent County Jury Commission, which oversees the Kent County jury processes; (2) the deposition of Terry Holtrop, with exhibits; (3) the report of Dr. Paul Stephenson; and (4) the report of Dr. Edward B. Rothman. *See* Hearing Exhibits [dkt. # 46].

Wayne Bentley testified that for ten years, he sent students from his government class to the Kent County circuit court to "go into the jury assembly room and count the minorities in the pool." Evid. Hr'g Tr. [dkt. # 46–1] at 15. "[F]or the better part of ten years, at least once a month we counted minority jurors every day for that month, and we did it right on through 2003." *Ibid.* Bentley described several irregularities in the Kent County jury system, but the one that has direct relevance to the petitioner's October 2001 trial had its origin in the summer of 2001. Bentley testified that is when he noticed the absence of African–Americans from jury venires. That prompted Bentley to file a FOIA request asking for addresses of all jurors summoned for a potential pool. After he received and analyzed the response, he learned that minority representation for the residents from the 49507 zip code area, which is the second largest population zip code, and has ninety percent African–American population, was "8.4 standard deviations below the norm," while representation of residents from the 49343 zip code, which is a predominantly white

suburb of Rockford, was "4.7 standard deviations above the norm." *Id.* at 27, 36.

Ultimately, a computer error was found to be the culprit. Terry Holtrop, a case management manager from Kent County, testified that after Bentley raised his concerns during Kent County Jury Commission meetings, the issue "came to a head" in September 2001, when Bentley became "very vocal about it." Holtrop dep. [dkt. # 46–2] at 9. Holtrop described the computer error as follows:

> My understanding is that a programmer, not intentionally, pulled—only pulled jurors from basically two zip codes, I believe, instead of the entire county. So that resulted in most of the jurors being summoned from an area that is considered mostly white.

*Id.* at 21. Holtrop explained that out of approximately 450,000 residents in the county, the program selected only 118,000, *id.* at 21–22, as a result of which "not only were the jurors geographically skewed, but they tended to be ethnically skewed as well," *id.* at 23.

On August 1, 2002, the Kent County IT department issued a report, which included an exhaustive explanation of the computer error. The report stated:

> Beginning in 2001, Kent County Information Technology (KCIT) began a project, using County IT staff, to move this entire process of updating and loading the State File into an Oracle database. The reasons behind this move were 1) cost cutting—to eliminate the annual payment to ACS for this effort and 2) timeliness—in that we were dealing with a vendor at a remote location and there was a significant lead-time requirement in getting an updated State File returned to Kent County so that it was available in jury p[ools]. The net effect of this incorrect parameter is that the Jury Management System performed a

random selection against the first 118,-169 prospective jurors on the file.

> It has been determined that in the initial set-up of the Oracle database to accommodate the driver's license and State ID data from the State File, an error was made in one parameter. Whether this was a programming error, the carryover of a setting that existed within the Sybase database, misinterpreting instructions, or simply human error, that is now almost impossible to determine. The parameter that was entered within the database was 118,169. What should have been inserted within this setting was the total number of records in the State File, or 453,981 in 2001.

> The net effect of this incorrect parameter is that the Jury Management System performed a random selection against the first 118,169 prospective jurors on the file. The percentage of jurors selected per Zip Code was proportional to the Zip Code composition of the first 118,169 records—but not Kent County as a whole....

> The next logical question being, why then did the jury p[ool] from Zip Code 49341 jump so dramatically for 2001, from an average of 3.8% up to 10.24% ... and why did the jury p[ools] from Zip Code 49507 decline from an average of 8.56% to 2.13%?

> The answer being that in 1998 ... the State File did not come in random order, but rather in Zip Code order ... lowest numbers to highest numbers. In subsequent years, new prospective jurors (either based on age or having moved to the County) were added to the end of the dataset. Existing prospective jurors (those that were on the file the previous year) would simply have address information updated based on what the State provided. Their position in the dataset would not change. Therefore, the first

118,169 records of the dataset have a high percent of the lower numbered zip codes. As is indicated on the map included in this packet, all the Zip Codes with the lower numbers are located outside of the Grand Rapids metro area.

. . .

In 2001, the process of changing databases from the Jury Management System ... was the genesis behind a mistake that was made in the database configuration. An incorrect parameter "told" the jury selection software that the total available pool size was only 118,169 individuals, when in fact it was much larger. The random selection process on the 118,169 records was proportionately correct for that pool size, but not the County in total.

For the time period of April 2001 to July 2002, the number of jurors pulled from Zip Codes that began with 493 ... was larger than normal, on a proportional basis.

Holtrop dep., Ex. 3, Kent County Jury Management System Report [dkt. # 46–2], at 137–38.

According to Holtrop, once the problem was corrected in mid–2002, there was a discernible increase in minority participation. Holtrop dep. [dkt. # 46–2] at 52; *see also* Holtrop dep., Ex. 6, Jury Management Study, Kent County, Michigan, Rev. July 1, 2003 [dkt. # 46–2] at 86 ("The problem has been recognized and has been resolved. Panels selected after August 2002 should not have the zip code bias."). After the problem was eliminated, the "Black representation went from 2.89% to 4.9% of the respondents." Jury Management Study [dkt. # 46–2] at 93.

The record in this case contains reports by two expert witnesses. The first report is by Paul L. Stephenson III, Ph.D., which was made for Kent County Circuit Court Judge Dennis Kolenda in the case of *Peo-*ple v. Bryant,* Kent County Docket No. 01–08625–FJ, and covers only January 2002, the month of Bryant's jury selection. Citing the 2000 United States Census data, Dr. Stephenson determined that 8.2 percent of the Kent County population of 18 years and older is Black or African–American, either alone or in combination with one or more other races. Paul L. Stephenson III, Ph.D., *A Statistical Analysis regarding the Potential Systematic Exclusion of Black or African Americans in the Jury Pools for the Kent County Circuit Court in Jan. of 2002,* Evid. Hr'g Tr., Ex. 2 [dkt. # 46–3]. Out of 45 potential jurors who were selected for the venire in Bryant's case, only one was Black or African–American. Stephenson concluded that "there is a 6.03 percent difference between the percentage of eligible Black and African–Americans in Kent County and the actual percentage in the venire." *Id.* at 45. Comparing this disparity to the population as a whole, Stephenson found that the venire for Bryant's trial had 73.1 percent fewer Black or African–American members than could have been expected in Kent County. Dr. Stephenson opined that "there is essentially no chance of acquiring the results we obtained if the selection process for potential jurors is unbiased," and "all the areas in Kent County with zip codes less than or equal to 49504 were underrepresented." *Id.* at 47–48. However, despite concluding that "systematic bias did exist in the selection of individuals summoned for jury duty during the first three months of 2002, ... [which] would have inevitably led to the under representation of Black or African–Americans in the terms during this period of time," *id.* at 49, Dr. Stephenson opined that since the venire in *People v. Bryant* contained at least one Black or African–American potential juror, "there is insufficient evidence

to conclude that the venire in this case was significantly biased," *id.* at 49.

The record also contains the report of Dr. Edward B. Rothman of the University of Michigan, who calculated the difference in the number of African–Americans in the population and those in the jury pools from April 2001 through August 2002 to be 3.45 percent, which translated into a 42 percent decrease in the likelihood that African–Americans would be found in the jury pool during that time period compared with what their census population suggested it should be. Evid. Hr'g Tr., Ex. 3, Report of Dr. Edward Rothman [dkt. # 46–4] at 1–2. Dr. Rothman noted a "sharp change from April 2001 through August 2002" in the number of African–Americans on the jury roll, and another change after August 2002. *Id.* at 7; *see also id.* at 9 ("The average estimated proportion of African–Americans or Hispanics has decreased substantially from the January 1998 through March 2001 time period to the April 2001 through August 2002 time period. The difference is statistically significant. . . .").

### 3.

█ In her objections, the respondent attacks the magistrate judge's conclusion that systematic underrepresentation of minorities occurred in Kent County during the relevant time on several bases. First, she argues that the magistrate judge erred because he "did not give the appropriate weight and consideration to Dr. Rothman's report and statistics in determining whether Petitioner had made out a prima facie case of systemic exclusion for purposes of *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)." According to the respondent, Rothman's report is *"the controlling document"* for the purpose of the statistical inquiry, because it was based on an analysis of the entire period during which the Kent County jury selec-

tion computer glitch was in effect. The respondent maintains that the difference between Dr. Rothman's results and those of Dr. Stephenson is crucial, because "it is important to demonstrate disparities that occur in venires *over time,"* citing *Ford v. Seabold,* 841 F.2d 677, 685 (6th Cir.1988) (noting a discrepancy that occurred "in every weekly venire for a period of nearly a year").

That argument fails for a number of reasons. Contrary to the respondent's contention, the magistrate judge did not discount Dr. Rothman's results, and he concluded that a significant disparity was shown under either analysis:

> Using either Dr. Rothman's or Dr. Stephenson's absolute disparity figures, i.e., 3.45% or 6.03%, Garcia–Dorantes has shown a percentage that exceeds the 3% that courts have recently found to be insufficient proof of underrepresentation. *See United States v. Mujahid,* 433 Fed.Appx. 559, 561 (9th Cir.2011) ("An absolute disparity of 2.87% is insufficient to make a prima facie showing of substantial underrepresentation"); *United States v. Rodriguez–Lara,* 421 F.3d 932, 943–44 (9th Cir.2005) (absolute disparity of 3% is too low to be evidence of underrepresentation and comparing cases finding 14.1% and 15.4% absolute disparity to satisfy second *Duren* prong); *United States v. Royal,* 174 F.3d 1, 10 (1st Cir.1999) (absolute disparity of 2.9% insufficient to show underrepresentation).

Rep. & Rec. [dkt. # 50] at 20–21.

Moreover, the authorities cited by the respondent do not establish the rules she evidently would propose, that statistical evidence covering the entire period during which an alleged discriminatory procedure was in place is more "controlling" than evidence drawn from a shorter period, or that evidence must cover the entire period

of an alleged discriminatory scheme's operation in order to be relevant. In *Duren* the Supreme Court considered evidence based on records from "June—October 1975 and January—March 1976," which comprised eight months out of a ten-month period leading up to and including the month in which the petitioner's jury was selected. *Duren,* 439 U.S. at 362, 99 S.Ct. 664. But the state constitutional provision that allowed women to claim an exemption from jury service had been present in Article 1 of the Missouri Constitution since at least 1945. Mo. Const. of 1945, Art. 1, § 22(b); *State v. Cole,* 354 Mo. 181, 189, 188 S.W.2d 43, 48 (1945).

As the respondent points out, "neither *Duren* nor any other decision of [the Supreme Court] specifies the method or test courts must use to measure the representation of distinctive groups in jury pools." *Smith,* 559 U.S. at 329, 130 S.Ct. 1382. And the central inquiry under the *Duren* analysis is not, as the respondent contends, whether the exclusion occurred "over time," but rather whether the statistical evidence establishes "that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized." *Duren,* 439 U.S. at 364, 99 S.Ct. 664. The Court found that the evidence presented in *Duren* did "manifestly indicate[ ] . . . that the under-representation was systematic," *ibid.,* but it did not hold that evidence from a shorter period would not have sufficed, or that evidence from a longer period was entitled to "controlling" weight over a study from a shorter period. Rather than disregarding either of the studies, the magistrate judge concluded that the petitioner could establish based on the largely consistent conclusions of both reports that the statistical underrepresentation observed in Kent County venires was both "systematic" and "inherent in the particular jury-selection process utilized," particularly in light of

the undisputed testimony by Kent County Jury Commissioner Wayne Bentley that a well-documented "glitch" in the County's jury selection computer program had introduced an apparent and significant programmatic error into the selection process.

The respondent cites *United States v. Horne,* 4 F.3d 579 (8th Cir.1993), for the proposition that a disparity within a single venire is insufficient to establish underrepresentation under *Duren.* Perhaps, but in *Horne* the defendant's statistical presentation related *only* to the panel from which the jurors in his particular case were selected. *Id.* at 588. Here, the Stephenson study covered the first three months of the year 2002—a period during which the parties agree that the computer glitch was in effect. The challenged report therefore is not confined only to the singular panel from which the petitioner's jury was drawn. And the respondent does not point to any evidence in the record suggesting that the glitch had a differential or varying effect on jury selection results during any particular part of the time that it was known to be in operation.

Second, the respondent contends that the magistrate judge erred in accepting the disparity established by the Rothman report as sufficient to show significant underrepresentation, citing cases from other circuits that have "rejected similar or even greater absolute and comparative disparities." *See* Resp.'s Supp. Brief [dkt. # 48], Ex. 1. The respondent also contends that the magistrate judge erred in rejecting the rule adopted in certain other circuits requiring a minimum of 10% absolute disparity for a finding of significant underrepresentation, because the seminal case from which that rule derives, *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), pre-dates *Duren.* .

Considering the absolute disparity figures cited by Dr. Rothman (3.45%) and Dr. Stephenson (6.03%), the magistrate judge noted that three recent cases have found an absolute disparity of 3% or less to be insufficient under *Duren*. *United States v. Mujahid*, 433 Fed.Appx. 559 (2011) (absolute disparity of 2.87% insufficient); *United States v. Rodriguez–Lara*, 421 F.3d 932 (9th Cir.2005) (3%); *United States v. Royal*, 174 F.3d 1 (1st Cir.1999) (2.9%). The magistrate judge also noted that neither absolute disparity figure would suffice under the standard requiring a minimum of 10% absolute disparity which has been adopted in other circuits, but he found that the 10% rule was not dispositive because the Sixth Circuit has not adopted it, and he suggested that the rule may be inapposite because it was derived from *Swain*, which was decided before *Duren*. That is a reasonable conclusion, especially in light of the Supreme Court's declination of the respondent's invitation to adopt such an inflexible rule, finding no need in such cases "to take sides today on the method or methods by which underrepresentation is appropriately measured." *Smith*, 559 U.S. at 329–30 & n. 4, 130 S.Ct. 1382.

Considering the comparative disparity figures cited by Rothman (42%) and Stephenson (73.1%), the magistrate judge found that the latter figure would suffice under some recent holdings, but the former would not, citing *United States v. Weaver*, 267 F.3d 231 (3d Cir.2001) (comparative disparities of 40.01% and 72.98% insufficient, where absolute disparities were 1.23% and 0.71% respectively); *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir.2000) (finding that comparative disparities of 40.89% and 58.39% were insufficient, but noting another holding that a 68.22% comparative disparity was sufficient); *United States v. Clifford*, 640 F.2d 150 (8th Cir.1981) (46% comparative disparity insufficient).

After reviewing those authorities, the magistrate judge concluded that the evidence was sufficient to support a finding of underrepresentation under *Duren*, because it "presents a more obvious example of exclusion 'inherent in the particular jury-selection process utilized' than that in *Smith*." Rep. & Rec. [dkt. # 50] at 22. The magistrate judge concluded that because the computer error "understated the county population by 3.8 times," and because of the unique circumstance that the input file listed names in zip code order, where the lower zip codes represented suburban areas with much smaller proportions of African–American residents, it was apparent that the computer selection routine inherently and systematically excluded African–Americans from the panels that were selected.

That conclusion follows logically from the evidence. There is evidence that exclusion of the African–American population from Kent County juries lasted for several months and became noticeable to an ordinary observer. Wayne Bentley testified that during the summer of 2001, he noticed the absence of African–American jurors in jury venires and would rarely see a jury venire that contained three percent of African–American members. Other jury commissioners likewise commented on the lack of minority jurors in the pools continuing into 2002. Dr. Rothman's report captures the dip in the presence of African–American jurors in the Kent County jury pools from April 2001 through July 2002 in the following table:

832

Sigma level:        3

Rothman Rep. at 7. As demonstrated, Dr. Rothman noted "a sharp [decrease] from April 2001 through August 2002" in the number of African–Americans on jury venires, and a return to pre-computer-error percentages in August 2002 after the defect was corrected.

In concluding that the petitioner had established systematic underrepresentation under *Duren*, the magistrate judge relied principally on *United States v. Jackman*, 46 F.3d 1240 (2d Cir.1995), in which significant underrepresentation resulted from a documented computer glitch that "caused the letter 'd' in 'Hartford' to communicate to the computer that all potential jurors from Hartford were deceased and thus unavailable for jury service." Rep. & Rec. [dkt. # 50] at 22. In *Jackman* the Second Circuit specifically rejected the suggestion that it rely on an absolute disparity statistical comparison as being dispositive of the question under *Duren*, in part because the absolute percentages of Black and Hispanic voters residing in the districts in question were low (6.34% and 5.07% of the population, respectively). The *Jackman* court also weighed heavily the fact that the procedure used to select the challenged venire drew primarily from juror lists that had been constructed using

a procedure that already had been found to be constitutionally flawed, with only a limited attempt to supplement the improperly constructed list using lists that did include Hartford residents. The court of appeals concluded that "[l]ike the prior total exclusion of Hartford and New Britain residents from the jury pool, the underrepresentation here 'was quite obviously due to the *system* by which juries were selected.' " *Jackman*, 46 F.3d 1240, 1248 (2d Cir.1995) (quoting *Duren*, 439 U.S. at 367, 99 S.Ct. 664 (emphasis in original)).

Although the magistrate judge considered the statistical data in light of the decisions of other courts, it is clear that he weighed heavily the unusual circumstance in this case that the particular computer glitch, like the procedure used in *Jackman*, had the inherent and obvious effect of systematically excluding from the venire the residents of defined geographic areas known to have a significantly higher population of jury-eligible minority residents compared with the areas that were disproportionately favored in the selection process. As the Supreme Court explained in *Smith*, it has not prescribed a particular method by which underrepresentation must be evaluated, either in terms of specific statistical methods or otherwise.

*Smith,* 559 U.S. at 329, 130 S.Ct. 1382. On the particular and unusual facts of this case, it is reasonable and sensible to weigh the apparent mathematical effects of a selection process that was biased in an undisputed and deterministic fashion at least as heavily as the nominal statistical outcome of that process, when deciding whether the petitioner has shown that the underrepresentation of minority jurors in his venire "was systematic—that is, inherent in the particular jury-selection process utilized," and that "the representation of [jury-eligible minority residents] in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." *Duren,* 439 U.S. at 364, 99 S.Ct. 664.

Statistical analysis may provide compelling evidence of systematic exclusion. But where, as here, the documented nature of the mechanical selection process itself facially demonstrates the precise means by which minority members of the community were systematically excluded from the venires produced, that also may provide compelling evidence that the resulting underrepresentation of minorities is not "fair and reasonable" under *Duren. See United States v. Ovalle,* 136 F.3d 1092, 1106 (6th Cir.1998) ("The government suggests that there is no proof that any group is underrepresented in the ultimate jury wheel so as to create an equal protection violation. That is not the point. The problem is the removal of persons from the jury wheel solely on the basis of race."). The respondent cites cases from other circuits which have rejected statistical disparities of the size shown in this case as insufficient standing alone to establish a *prima facie* case of underrepresentation under *Duren,* but she does not attempt to address or distinguish the overarching principles of *Duren* and *Jackman,* on which the magistrate judge relied for his conclusion.

Third, the respondent argues that the magistrate judge misconstrued and disregarded the "precedentially binding" decision in *United States v. Buchanan,* 213 F.3d 302 (6th Cir.2000). However, in her objection, the respondent persists in a disturbing and careless misreading of the facts of *Buchanan,* where she contends that

> [c]omparing the general population of African Americans to those who were generally qualified to serve demonstrates a 2.09% absolute disparity, subtracting 2.49% from 4.58%. This would yield a 45% comparative disparity (dividing the absolute disparity 2.09% by the total percentage 4.58% in the community).

Resp.'s Supp. Brief [dkt. # 48] at 26. The respondent argues that because Dr. Rothman's analysis is "controlling," and because it revealed a comparative disparity less than the 45% that the respondent alleges was shown in *Buchanan,* the evidence derived from Dr. Rothman's report is not sufficient to establish a significant disparity in this case.

However, as the petitioner points out in his response to the objections, the respondent in her briefing has misapplied the absolute disparity calculation by subtracting the percentage of African–Americans in the venire from those in the entire community. The correct method—and the one on which the Sixth Circuit based its holding in *Buchanan*—involves subtracting the percentage of African–Americans in the venire from the percentage in the community *who were eligible for jury service*—not the percentage in the population as a whole. The Sixth Circuit's explanation makes clear that it used the latter method:

> The testimony of the jury clerk established that African–Americans comprise 4.58% of the total population of the

counties located within the Grand Rapids jury wheel. *Of those residents who qualify for jury service, 2.49% are African–American.* In the instant action, there were two African–Americans in a venire of seventy, constituting 2.86% of the venire, *which slightly exceeds the proportion of African–Americans in the Grand Rapids area qualified to serve as jurors.* These statistics indicate that there was no violation of the fair cross-section requirement in this case.

*Buchanan,* 213 F.3d at 310 (emphasis added). As the court of appeals noted, its finding of no statistical disparity was based on the fact that the percentage of jurors in the venire was *higher* than the percentage of eligible voters in the county. That result could only follow from the correct subtraction of 2.49% from 2.86%—not the incorrect subtraction of 2.86% from 4.58% on which the respondent relies in her briefing. Because the statistical evidence in *Buchanan* showed a percentage of minority voters in the venire that was higher than that in the jury-eligible population, its holding is inapposite to the situation here, where the statistical evidence under both of the offered analyses showed an underrepresentation in the venire.

The respondent's criticism of the magistrate judge's determination of the evidence at the hearing has no merit. That objection will be overruled.

### D.

The respondent also argues that the Supreme Court erred when it decided *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Apparently, it is the official position of the state attorney general that the Sixth Amendment does not guarantee Michigan citizens the right to a jury selected from a fair cross-section of the community. The Supreme Court declined to adopt that view in *Smith,* and instead held that "[t]he Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Smith,* 559 U.S. at 319, 130 S.Ct. 1382 (citing *Taylor,* 419 U.S. 522, 95 S.Ct. 692). The Court also declined to take up that argument again when it denied *certiorari* in *Ambrose. Ambrose v. Booker,* —— U.S. ——, 133 S.Ct. 993, 184 L.Ed.2d 771 (2013) (order denying petition for *certiorari*). This Court finds no merit in the argument, and nonetheless is bound by Supreme Court precedent. That objection will be overruled.

### II.

One last point must be addressed. The Court referred the case to the magistrate judge to conduct a hearing to determine, among other things, the ethnic composition of the jury venire in the defendant's case. That direction was based in part on the Court's view expressed in *Parks v. Warren,* 773 F.Supp.2d 715, 726–27 (E.D.Mich. 2011), that the systematic underrepresentation of minorities in the jury pool could be harmless if a particular venire by happenstance fairly represented the racial makeup of the community. The magistrate judge criticized that holding in his report in this case, and rightly so. *See* Rep. & Rec. at 17 n. 12. A fair reading of the authorities on that point does not support the Court's decision in *Parks.*

The Sixth Circuit addressed that issue in *Ambrose,* stating:

> A petitioner raising this claim is challenging the pool from which the jury is drawn, and not necessarily the venire panel directly before him. Accordingly, the composition of one panel does not indicate whether a fair cross-section claim exists.

The irrelevance of the composition of a single venire panel is underscored by the fact that a petitioner may bring a claim even if minorities are included in his panel. The Sixth Amendment guarantees only the opportunity for a representative jury, not a representative jury itself. The focus, therefore, is on the procedure for selecting juries, and not the outcome of that process. As the First Circuit eloquently put it:

> [T]o hold that a litigant is not entitled to a representative jury when the jury venires are drawn from a fair cross-section of the community but that the cross-section requirement can be dispensed with when the dice fall a particular way in an individual case undermines the analytical foundation upon which the right to a jury drawn from a cross-section of the community is based.

*Barber v. Ponte,* 772 F.2d 982, 993 (1st Cir.1985), *vacated on other grounds,* 772 F.2d 996 (1st Cir.1985) (en banc).

*Ambrose,* 684 F.3d at 645–46.

■ This Court, therefore, repudiates its holding in *Parks,* and concludes that the racial and ethnic composition of the actual venire from which the petitioner's jury was drawn is irrelevant. The Court finds that the petitioner has established a *prima facie* violation of the fair cross-section requirement under the Sixth Amendment. The burden shifts to the State to show a "significant state interest [that is] manifestly and primarily advanced by those aspects of the jury-selection systems, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Duren,* 439 U.S. at 367–68, 99 S.Ct. 664. The State makes no claim that any such interest exists in this case.

## III.

The petitioner has established cause and prejudice sufficient to excuse his procedural default. Although the magistrate judge mistakenly held that prejudice could be presumed, the evidence shows that the petitioner has shown actual prejudice. Moreover, the record reflects that at the time he was tried, the petitioner's jury was selected from a pool assembled by using a method that systematically excluded African–American jurors from that pool, in violation of the Sixth Amendment. The Court therefore will grant the petition for a writ of habeas corpus.

Accordingly, it is **ORDERED** that the magistrate judge's report and recommendation [dkt. # 50] is **ADOPTED IN PART.**

It is further **ORDERED** that the respondent's objections to the report and recommendation [dkt. # 51] are **OVERRULED.**

It is further **ORDERED** that the petition for writ of habeas corpus is **CONDITIONALLY GRANTED.**

It is further **ORDERED** that the respondent shall release the petitioner from custody unless the State brings him to trial again within seventy days.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AFTER EVIDENTIARY HEARING

CHARLES E. BINDER, United States Magistrate Judge.

### I. RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Petitioner Garcia–Dorantes' habeas claim that he was denied his Sixth Amendment right to a fair and impartial jury drawn from a fair cross section of the community be allowed to proceed because Petitioner Garcia–Do-

rantes has established a *prima facie* case which has not been rebutted by Respondent.

## II. REPORT

### A. Background & Procedural History

Petitioner Antonio Garcia–Dorantes ("Garcia–Dorantes") is a Michigan state prisoner who, at the time of the filing of this petition, was confined at the Thumb Correctional Facility in Lapeer, Michigan. Garcia–Dorantes was convicted of second-degree murder and assault with the intent to do great bodily harm less than murder on September 10, 2001, in Kent County, Michigan. (Doc. 1 at 1–2.)

This habeas corpus case brought pursuant to 28 U.S.C. § 2254 was referred to the undersigned magistrate judge for purposes of holding an evidentiary hearing and issuing a Report and Recommendation ("R & R") regarding the remaining claim of whether Petitioner's "Sixth Amendment right to a jury drawn from a fair cross section of the community was violated." (Doc. 36 at 31.) In the reference order, the district judge noted that since the undersigned magistrate judge "has conducted hearings on other cases arising from prosecutions during the period when jury panels were selected using the defective system that resulted in the exclusion of population segments in Kent County that contained the highest concentration of minority citizens[,]" the undersigned magistrate judge "may incorporate the evidence from those hearings, with the consent of the parties." (*Id.*)

At the evidentiary hearing held in this case on August 25, 2011, the parties stipulated to the admission of the following evidence, all of which was initially introduced during the joint evidentiary hearing held in the cases of *Parks v. Warren,* No. 05–10036 (E.D.Mich.), and *Ambrose v.*

*Booker,* No. 06–13361 (E.D.Mich.): (1) transcript of hearing; (2) transcript of deposition of Terry Holtrop; (3) report of Paul L. Stephenson, Grand Valley State University, prepared for *People v. Bryant,* Kent County Circuit Court Number 01–08625; and (4) report of Dr. Edward Rothman, University of Michigan. (Doc. 47 at 6–7.)

After the August 2011 evidentiary hearing, supplemental briefs were filed by both parties; thus, the matter is ready for Report and Recommendation.

### B. Governing Law

In order to establish a *prima facie* violation of the Sixth Amendment's right to a jury representing a fair cross section of the community, a petitioner must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community [cognizable prong]; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community [underrepresentation prong]; and (3) that underrepresentation is due to systematic exclusion of the group in the jury-selection process [systematic exclusion prong]." *United States v. Ovalle,* 136 F.3d 1092, 1098 n. 7 (6th Cir.1998) (citing *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)). Exclusion need not be intentional to be unconstitutional under the Sixth Amendment's fair-cross-section guarantee, but the exclusion must be systematic. *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. 664. Systematic means "inherent in the particular jury-selection process utilized." *Id.* at 366, 99 S.Ct. 664.

If a *prima facie* violation is established, the government is required to show that "a significant state interest [is] manifestly and primarily advanced by those aspects of

the jury-selection process ... that result in the disproportionate exclusion of a distinctive group" in order to rebut the presumption. *Id.* at 367–68, 99 S.Ct. 664.

## C. Evidence from *Parks* and *Ambrose*

On October 26, 2009, an evidentiary hearing was held in the *Parks* and *Ambrose* cases and the transcript has been admitted in the instant case (Doc. 46 at Ex. 1) by stipulation of the parties. (Doc. 47 at 6.) At the 2009 hearing, Wayne Bentley, a teacher in Grand Rapids Public Schools, testified that he has been a member of the Kent County Jury Commission since 1998. (Doc. 46, Ex. 1 at 14.) This unique board of three oversees the Kent County jury processes. (*Id.*) Mr. Bentley testified that he regularly took his government class to the Kent County Circuit Court to "go into the jury assembly room and count the minorities." (*Id.* at 15.)

Terry Holtrop, case management manager for the Kent County Circuit Court since March 2001, testified in a deposition [1] that shortly after he became employed with the court, jury commissioner Wayne Bentley became vocal about the lack of minorities in the jury pools. (Doc. 46, Ex. 2 at 6, 9.) Concern about the racial composition of the venire "came to a head" in September 2001 after Mr. Bentley's high school class created a report on the issue as part of a class project. (*Id.* at 9–10.) Mr. Holtrop indicated that sometime after November 2001, the county implemented Commissioner Bentley's suggestion that when a jury questionnaire is returned from a particular zip code, another questionnaire be sent to someone from that same zip code to help increase minority

representation. (*Id.* at 12–13.) Mr. Holtrop stated that since the 2002 computer system change to correct the zip code bias, he does not believe that there have been any problems with underrepresentation. (*Id.* at 13–14.)

The Kent County Jury Management System Report (hereafter "the Report"), which is dated August 1, 2002 (Doc. 46, Ex. 2 at 134),[2] describes the genesis of the computer error described by Mr. Bentley during his hearing testimony. The Report first indicates that the random number generator used in the County's jury management system functioned properly and was not the source of any problems. (*Id.* at 138.) The Report indicates that in April 2001, the job of updating and loading the state files of eligible jurors was taken over by the county as part of a cost-cutting effort. (*Id.* at 137.) The Report explains:

[I]n the initial set-up of the Oracle database to accommodate the driver's license and State ID data from the State file, an error was made in one parameter. Whether this was a programming error, the carry-over of a setting that existed within the Sybase database, misinterpreting instructions, or simply human error, that is now almost impossible to determine. The parameter that was entered within the database was 118,169. What should have been inserted within this setting was the total number of records in the State File, or 453,981 in 2001.

The net effect of this incorrect parameter is that the Jury Management System performed a random selection against the first 118,169 jurors on the file. The percentage of jurors selected per Zip

---

1. This deposition was taken for presentation in the Eastern District of Michigan case of *Powell v. Howes,* Case No. 05–71345.

2. The Report was an exhibit included with Terry Holtrop's deposition and his deposition was received in this instant case pursuant to the parties' stipulation. (Doc. 47 at 6.).

Code was proportional to the Zip Code composition of the first 118,169 records—but not Kent County as a whole. The total pool of prospective jurors from the State File is of course 3.8 times larger than the 118,169 and hence the type of jury pull data as is evidenced in the various tables included in this report, for the second half of 2001 and the first half of 2002.

The next logical question being, why then did the jury pull from Zip Code 49341 jump so dramatically for 2001, from an average of 3.8% up to 10.24% ... and why did the jury pulls from Zip Code 49507 decline from an average of 8.56% to 2.13%?

The answer being that in 1998 (as was mentioned previously) the State File did not come in random order, but rather in Zip Code order ... lowest numbers to highest numbers. In subsequent years, new prospective jurors (either based on age or having moved to the County) were added to the end of the database. Existing prospective jurors (those that were on file the previous year) would simply have address information updated based on what the State provided. Their position in the dataset would not change. Therefore, the first 118,169 records of the dataset have a high percentage of lower numbered zip codes. As indicated on the map included in his packet, all the Zip Codes with the lower numbers are located outside of the Grand Rapids metro area.

(*Id.* at 137–38.) The Report indicated that the error occurred from April 2001 through July 2002 and that the error had been corrected as of the date of the Report, i.e., August 1, 2002. (*Id.* at 138.) I note that Garcia–Dorantes' trial began on August 27, 2001. (Doc. 21.) Therefore, Garcia–Dorantes was affected by the computer error discussed above.

A report prepared by Paul L. Stephenson, III, Ph.D., was also submitted. (Doc. 46. Ex. 2 at 52.) Dr. Stephenson's report was prepared for Judge Dennis Kolenda of the Kent County Circuit Court and it analyzed the Kent County jury pool for the trial *People v. Bryant,* which was held in January 2002. (*Id.*) Dr. Stephenson concluded that the absolute disparity test[3] "result indicates that there is a 6.03 percent difference between the percentage of eligible Black and African Americans in Kent County and the actual percentage in the venire." (*Id.* at 54.) Dr. Stephenson further concluded that the comparative disparity test[4] showed that the *Bryant* trial "had 73.1% fewer Black or African American members than could have been expected in Kent County." (*Id.*) Dr. Stephenson suggests that neither the absolute nor comparative disparity tests are "viable for inferential purposes" because they are "not capable of identifying whether this group is statistically significantly underrepresented and small changes in the venire representation will unduly distort the analysis ...." (*Id.*)

Using the standard deviation[5] and binomial tests, Dr. Stephenson concluded that

---

**3.** The Supreme Court has explained that the " '[a]bsolute disparity' is determined by subtracting the percentage of African–Americans in the jury pool ... from the percentage of African–Americans in the local, jury-eligible population[.]" *Berghuis v. Smith,* 559 U.S. 314, 130 S.Ct. 1382, 1390, 176 L.Ed.2d 249 (2010).

**4.** The Court in *Smith* also stated that " 'comparative disparity' is determined by dividing the absolute disparity ... by the group's representation in the jury-eligible population[.]" *Smith,* 130 S.Ct. at 1390.

**5.** According to the Supreme Court, "[s]tandard deviation analysis seeks to determine the probability that the disparity between a group's jury-eligible population and the

there was "insufficient evidence to demonstrate that the representation of Blacks or African Americans *in the venire* is biased, this is in part due to the size of the venire." (*Id.* at 55 (emphasis in original).) After employing the Chi-square Goodness-of-fit test, Dr. Stephenson found that "there is essentially no chance of acquiring the results we obtained if the selection process for potential jurors is unbiased. As a result, there is overwhelming evidence to conclude that the selection process *for terms* during the first months of 2002 was biased." (*Id.* at 56 (emphasis in original).) Dr. Stephenson's summary stated that a "systematic bias did exist in the selection of individuals summoned for jury duty during the first three months of 2002. This bias would have inevitably led to underrepresentation of Black or African Americans in the terms during this period of time." (*Id.* at 58.)

The parties also submitted a report by Edward Rothman, Ph.D., who performed an analysis of the Kent County jury pool between January 1998 and December 2002. (Doc. 46 at Ex. 4.) Dr. Rothman's analysis concluded that the period between April 2001 and August 2002 revealed significantly more underrepresentation of African Americans than the earlier period studied. (*Id.* at 7, 9.) Dr. Rothman found that the absolute disparity between jury-eligible African Americans and those who appeared on jury venires was 3.45% between April 2001 and August 2002. (*Id.* at 1–2.) Dr. Rothman further concluded that the comparative disparity during this time period was 42%. (*Id.* at 2.) Dr. Rothman also considered and concluded that the absolute disparity between jury-eligible African Americans or Hispanics and those who appeared on jury venires between

April 2001 and August 2002 was 4% and the comparative disparity was 29%. (*Id.*)

## D. Evidentiary Hearing in This Case

At the hearing held on September 13, 2011, when asked about the racial make-up of the jury pool from which his petit jury was drawn, Garcia–Dorantes testified, "I don't remember very well—but the majority of them were of white race." (Doc. 47 at 10.) When asked if he remembered any Black or African–American people, Garcia–Dorantes responded, "I don't remember." (*Id.*) As to Spanish-speaking people, Garcia–Dorantes stated, "I don't know if that person spoke Spanish, but he did understand some." (*Id.* at 11.)

Gail Van Timmerman, Jury Clerk Coordinator at the time of Garcia–Dorantes' trial, testified that from September 2001 through the time when the zip code bias was resolved, she was "manipulating the panel in order to add ethnicity into the panel, especially if it was black, yes." (Doc. 47 at 26–27.) She stated that she did not manipulate any jury venires at the time of Garcia–Dorantes' trial, which began on August 27, 2001, because the manipulation "never happened in the old courthouse" and the move to the new courthouse occurred sometime in September 2001. (*Id.* at 36.) Van Timmerman explained what she means by manipulating the panel: she "would call the ... panel, and then [she] would see that there were no blacks—and then [she] would remove some of those jurors and replace them visually with jurors that were black." (*Id.* at 29–30.) Van Timmerman added that she only manipulated the venires once or twice and that "I do believe the judges were aware of what I was doing, because I thought it was the right thing to do. We

group's percentage in the qualified jury pool is attributable to random chance." *Smith,*

130 S.Ct. at 1390 n. 1.

absolutely had no one to go into voir dire if you had a black defendant, you know. There were no black jurors." (*Id.* at 28.) She further testified, "I don't believe we ever did it for Hispanic persons, and the reason is, is because I ... thought our percentages or our numbers for Hispanics were much higher than for African Americans. In other words, I could visually see three or four Hispanics in a Monday pool ... [whereas] you would often not see any black people at all." (*Id.* at 29.)

### E. Analysis & Conclusions

#### 1. Procedural Default

Respondent contends that Garcia–Dorantes has "procedurally defaulted his fair cross section claim in the state court by failing to object to the jury venire before the jury was impaneled and sworn. He has not shown cause and prejudice so as to excuse the default or that a fundamental miscarriage of justice would result by this Court's failure to consider his claim." (Doc. 48 at 12.)

#### a. Applicable Standards

The AEDPA provides that federal courts "cannot grant a writ of habeas corpus to a prisoner held in state custody unless '(A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.'" *D'Ambrosio v. Bagley,* 527 F.3d 489, 495 (6th Cir.2008) (quoting 28 U.S.C. § 2254(b)(1)). The "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3).

Federal courts lack jurisdiction to consider claims in a habeas petition that were not "fairly presented" to the state courts. *Franklin v. Rose,* 811 F.2d 322, 324–25 (6th Cir.1987). To "fairly present" a federal claim in the state court, a petitioner must plead both factual and legal bases for the claim. *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir.2000). Meeting this standard does not require recitation of "chapter and verse" of constitutional law, but rather requires only "adequately appris[ing] the state courts of the constitutional theory to be relied upon at appellate review." *Franklin,* 811 F.2d at 326; *see also Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (petitioners need not "cite book and verse on the federal constitution" to satisfy the exhaustion requirement).

The Sixth Circuit has explained that

[w]hen a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review.

*Seymour v. Walker,* 224 F.3d 542, 549 (6th Cir.2000) (quoted with approval in *Broom v. Mitchell,* 441 F.3d 392, 401 (6th Cir. 2006)). In addition, procedural default occurs where a petitioner fails to comply with a state procedural rule that required him to have done something at trial to preserve an issue, e.g., make a contemporaneous objection or file a motion for directed verdict. *United States v. Frady,* 456 U.S. 152, 167–69, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and ade-

quate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The Sixth Circuit has set forth a four-part test for determining whether a prisoner's claim is procedurally defaulted and therefore barred from habeas review. *Cooey v. Coyle,* 289 F.3d 882, 897 (6th Cir.2002); *Maupin v. Smith,* 785 F.2d 135 (6th Cir.1986).

The first step of the procedural default analysis is to determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. *Maupin,* 785 F.2d at 138. Second, the court must determine whether the procedural sanction was actually enforced by the state courts—that is, whether the state courts actually based their decision on the procedural rule. *Id.* "In determining whether state courts have relied on a procedural rule to bar review of a claim, we look to the last reasoned opinion of the state courts...." *Mason v. Mitchell,* 320 F.3d 604, 635 (6th Cir.2003). *See also Combs v. Coyle,* 205 F.3d 269, 275 (6th Cir.2000) (citing *Ylst v. Nunnemaker,* 501 U.S. 797, 805, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (to determine "[w]hether a state court rested its holding on procedural default so as to bar federal habeas relief ..., we look to the 'last *explained* state-court judgment'")).

Third, the federal court must consider whether the procedural rule is an adequate and independent state ground on which

the state can rely to foreclose federal review of a federal constitutional claim. *Maupin,* 785 F.2d at 138. The fourth prong provides that, if the above three factors are met, the Court may still excuse the default and address the merits of the claim if the petitioner can demonstrate that there was cause for him to not follow the state's procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* Cause exists if there is an "objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Coleman,* 501 U.S. at 752, 111 S.Ct. 2546. It is Petitioner's burden to demonstrate both cause and prejudice. *Simpson v. Jones,* 238 F.3d 399, 408 (6th Cir.2000).

### b. Application and Analysis

Turning to the first three steps of the procedural default analysis, Michigan has a contemporaneous objection rule which provides that a party's failure to object at trial leads to the claim being waived and reviewed solely for plain error. *See People v. Eccles,* 260 Mich.App. 379, 385, 677 N.W.2d 76 (2004) (applying rule to alleged Sixth Amendment fair cross section and Fourteenth Amendment *Batson* errors). In the instant case, the Michigan Court of Appeals applied the procedural rule and enforced its sanction against Petitioner's Sixth Amendment fair-cross-section claim. *People v. Garcia–Dorantes,* No. 239306, 2003 WL 22416511, at *2 (Mich.Ct.App. Oct. 23, 2003).[6] "Michigan's contemporaneous-objection rule is both a well-established and normally enforced procedural rule" that "constitutes an adequate and independent state ground for foreclosing federal review." *Taylor v. McKee,* 649 F.3d 446, 451 (6th Cir.2011).

---

**6.** The Michigan Supreme Court denied review. *People v. Garcia–Dorantes,* 477 Mich. 1005, 726 N.W.2d 41 (2007).

The sole remaining question, then, involves the fourth step; namely, whether Petitioner has demonstrated "cause" justifying neglect of the procedural rule and "prejudice" actually resulting from the alleged constitutional error. *Greer v. Mitchell,* 264 F.3d 663, 673 (6th Cir.2001).[7]

As to cause, Garcia–Dorantes testified that although he doesn't "remember very well," he thinks that "the majority of [of the people on the jury panel] were of white race." (Doc. 47 at 10.) When asked if he remembered any Black or African–American people, Garcia–Dorantes responded, "I don't remember." (*Id.*) As to Spanish-speaking people, Garcia–Dorantes stated, "I don't know if that person spoke Spanish, but he did understand some." (*Id.* at 11.) Ms. Van Timmerman testified that "you would often not see any black people at all." (Doc. 47 at 29–30.) In addition, the parties submitted testimonial evidence from Mr. Holtrop that soon after March 2001, jury commissioner Wayne Bentley became vocal about the lack of minorities in the jury pools (Doc. 46, Ex. 2 at 6, 9) and concern about the racial composition of the venire "came to a head" in September 2001 after Mr. Bentley's high school class created a report on the issue as part of a class project. (*Id.* at 9–10.) Garcia–Dorantes' trial began between those two dates, on August 27, 2001. (Doc. 21.)

Therefore, the evidence shows that the racial composition issue was known and steps (albeit less than effective ones) were being taken to alleviate the problem at the time of Garcia–Dorantes' trial. However, the Report that identified and described the computer error and thus led to its correction was not published until August 1, 2002, almost one year after Garcia–Dorantes' trial began. (Doc. 46, Ex. 2 at 134).[8]

Both counsel are correct in noting that the district courts have reached inconsistent results as to whether petitioners can establish cause under like circumstances. Courts that have found cause existed have focused on the fact that no one, including all the Kent County officials responsible for the jury panel composition, was aware of the computer "glitch" at the time of trial and that since a discrepancy in a single jury panel is insufficient to show underrepresentation under *Duren,* the composition of a petitioner's jury panel alone should not be expected to have spurred an objection. *See Ambrose v. Booker,* 781 F.Supp.2d 532, 541–43 (E.D.Mich.2011) (also finding prejudice because systematic underrepresentation is a structural error for which prejudice is presumed); *Parks v. Warren,* 574 F.Supp.2d 737, 744 (E.D.Mich.2008).

On the other hand, the district courts that have found that a petitioner could not establish cause have relied on the Michigan law providing that a criminal defendant is on notice once he has viewed the jury panel and that constitutional claims must be preserved by objection at the trial court level, even where the petitioner had no reason to know of the underlying cause of the problem, i.e., the computer "glitch." *See Wilbon v. Romanowski,* No. 07–12780, 2010 WL 3702580, at *13 (E.D.Mich. Aug. 20, 2010); *Carter v. Lafler,* No. 1:09–cv–215, 2010 WL 160814, at *3 (W.D.Mich.

---

7. As noted by Judge Lawson, the miscarriage of justice exception does not apply here since it applies only to cases where factual innocence has been supported with new and reliable exculpatory evidence and Garcia–Dorantes has not presented any such evidence. (Doc. 36 at 11–12.)

8. In addition, as noted by Judge Lawson, a newspaper article describing the computer glitch appeared in the Grand Rapids Press on July 30, 2002, which was around the same time as the Report. (Doc. 36 at 13.)

Jan. 8, 2010); *Wellborn v. Berghuis,* No. 1:05–cv–346, 2009 WL 891708, at *3–4 (W.D.Mich. Mar. 31, 2009); *Burros v. Curtin,* No. 05–701, 2009 WL 736066, at *6–9 (W.D.Mich. Mar. 18, 2009). Many of the cases which found no cause distinguished *Amadeo v. Zant,* 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988), on the basis that, in *Amadeo,* county officials had concealed the memorandum intentionally designed to result in underrepresentation of blacks and women in the master jury wheel, whereas in this case it has not been alleged that Kent County engaged in any intentional conduct designed to cause or conceal the underrepresentation. *See Wellborn,* 2009 WL 891708 at *4; *Burros,* 2009 WL 736066, at *6.

Although reasoned analysis supports both sides of this question, I suggest that cause exists in the instant case. The testimony of both Garcia–Dorantes and the jury clerk, Ms. Van Timmerman, establish that even if there were no visibly-apparent African–American jurors on the venire panel, there usually were visibly-apparent Hispanics and that there was at least one Hispanic on Garcia–Dorantes' venire panel. (Doc. 47 at 10; 29–30.) The existence of some minority representation may have obscured counsel's potential discovery of the underrepresentation of African–American jurors. In addition, although the evidence revealed that there was concern about the potential underrepresentation problem at the time Garcia–Dorantes' trial began, the issue did not "come to a head" until after his trial began, perhaps even after his trial concluded. (Doc. 46, Ex. 2 at 6, 9–10.) It is clear that the Report describing the problem was not published until long after Garcia–Dorantes' trial concluded. (Doc. 46, Ex. 2 at 134.) I therefore suggest that, under these circumstances, it would be unfair to conclude that counsel should have guessed, upon viewing the venire panel, that the process creating the master jury wheel was flawed and therefore entered an objection.

This case does not present a situation where counsel may have had suspicions regarding the venire panel but chose not to object based on trial strategy; here, I suggest, counsel could not reasonably have known of the underrepresentation problem until after trial. *Cf. United States v. Boulding,* 412 Fed.Appx. 798, 802 (6th Cir. 2011) (no cause excusing failure to object where counsel indicated that he only knew of the underrepresentation when he saw the jury panel and that "he failed to object during jury selection because he did not wish to alienate the jury"). I therefore recommend that cause be found to exist on this record.

As to prejudice, it is to be presumed when the alleged error is structural, and the systematic exclusion based on race in the selection of jurors is a structural error. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 257, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (citing *Vasquez v. Hillery,* 474 U.S. 254, 260–64, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jurors)). Thus, I suggest that prejudice exists in this case.

Having found that Petitioner's habeas claim is not barred by the doctrine of procedural default, I will turn to the merits of the claim.

## 2. Merits

### a. Applicable Standards

To establish a *prima facie* violation of the Sixth Amendment's right to a jury representing a fair cross section of the community, Petitioner must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community [cognizable prong]; (2) that the representation of this group in venires from which juries

are selected is not fair and reasonable in relation to the number of such persons in the community [underrepresentation prong]; and (3) that underrepresentation is due to systematic exclusion of the group in the jury-selection process [systematic exclusion prong]." *United States v. Ovalle*, 136 F.3d 1092, 1098 n. 7 (6th Cir. 1998) (citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)).

In the instant case, it is undisputed that African–Americans are a cognizable group. *Lockhart v. McCree*, 476 U.S. 162, 175, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).[9] I also note that neither party contests that Garica–Dorantes, a Hispanic man, is able to bring forth his claim that African–Americans have been underrepresented, i.e., no one has challenged the ability of a person of one cognizable group to raise the fair-cross-section requirements of a different cognizable group. If such an argument were raised, it would fail. *See Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (extending *Batson*[10] rule to hold that a prosecutor may not use peremptory challenges to exclude black prospective jurors from a white criminal defendant's jury on account of their race); *Echlin v. LeCureux*, 995 F.2d 1344, 1350 (6th Cir.1993) ("The *Powers* Court made it clear, for the first time we believe, that the race of both the defendant and of the excluded juror are irrelevant to an equal protection analysis."). *See also Holland v. Illinois*, 493 U.S. 474, 477, 110 S.Ct. 803,

107 L.Ed.2d 905 (1990) (white man had standing to raise a Sixth Amendment challenge to the exclusion of blacks from his jury); *Taylor v. Louisiana*, 419 U.S. 522, 526, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (Taylor could make a fair-cross-section claim that women were being excluded even though he was a man because "there is no rule that claims such as Taylor presents may be made only by those defendants who are members of the group excluded from jury service.").

However, the underrepresentation and systematic exclusion prongs are contested. As to underrepresentation, "[d]efendants are not entitled to a jury of any particular composition, but the jury wheels, pool of names, panels or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538, 95 S.Ct. 692 (citations omitted).[11] "Thus, the Supreme Court has explained that the Sixth Amendment's 'fair cross-section' requirement applies only to the larger pool serving as the source of prospective jurors' names ...." *United States v. Riddle*, 691 F.Supp.2d 737, 742 (E.D.Mich.2010) (denying criminal defendant's motion to dismiss because defendant had "improperly focused on the composition of the 100 prospective jurors, rather than the process for creating the Master Wheel"). Therefore, if it can be shown that underrepresentation at the master jury wheel level was the product of sys-

---

**9.** Hispanics are also a cognizable group. *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972).

**10.** *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**11.** The terminology used to describe the jury selection process is not consistent, possibly explaining the Court's reference to "jury wheels, pool of names, panels or venires from

which juries are drawn." *Id.* For purposes of this Report, "master jury wheel," "jury wheel" and "pool of names" may be used interchangeably to denote the process of gathering names of potential jurors and narrowing those down to jury-eligible persons. "Venire panel" will be used to describe the weekly or monthly panel of persons called for jury duty from which the petit jury is drawn.

tematic exclusion, the government may not defeat that claim by pointing to fair representation on the petit jury or the venire panel from which the petit jury was drawn.[12] *Id. See also Rabinowitz v. United States,* 366 F.2d 34, 59 (5th Cir.1966) ("the Government argues that the indictments should stand since there were, in fact, 5 Negroes on the grand jury ... [but] this evidences a basic misconception. The focus of the law is on the list from which jury is drawn and not on the composition of a particular jury or grand jury.").

To allow a Sixth Amendment claim to be diffused by the government's showing that, despite the systematic exclusion of a cognizable group at the master jury wheel level, the particular venire panel or petit jury at issue was representative, would be to permit harmless error analysis where it is not permitted. Underrepresentation due to systematic exclusion is a structural error and, once proven, prejudice is presumed. *United States v. Gonzalez–Lopez,* 548 U.S.

140, 148–49, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (systematic exclusion based on race from the jury pool is a structural error, prejudice is presumed, and harmless error analysis is not appropriate); *accord Vasquez v. Hillery,* 474 U.S. 254, 263–64, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986).

This conclusion is buttressed by the longstanding tenet that the "systematic and intentional exclusion of [a cognizable group] deprives the jury system of the broad base it was designed [ ] to have in our democratic society." *Ballard v. United States,* 329 U.S. 187, 195, 67 S.Ct. 261, 91 L.Ed. 181 (1946). "The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." *Id.*

As to the systematic prong, exclusion need not be intentional to be unconstitutional under the Sixth Amendment's fair-

---

**12.** I note that one district court case has held to the contrary. In *Parks v. Warren,* 773 F.Supp.2d 715, 726–27 (E.D.Mich.2011), the writ of habeas corpus was denied because, although the Kent County jury selection process as a whole resulted in underrepresentation of African–Americans in the jury pool, minority representation in the specific venire panel chosen from that pool at the petitioner's trial was proportionate with the minority representation in the community. The court stated that:

> although the respondent never brought these facts to the court's attention, in the [petitioner's] jury venire [panel] of 45 people, the affidavits demonstrate that the minority composition of the petitioner's jury venire was 8.89%. According to the census data, Kent County's total population of 574,375 people included 51,287 African Americans. Remarkably, the minority percentage of Kent County population was 8.93%. Therefore, the racial composition of the petitioner's jury venire reflected almost exactly the proportion of minorities in the community.

*Parks,* 773 F.Supp.2d at 726. Although a phrase from *Taylor* was quoted in support of the holding, the additional language placed before the quoted phrase does not appear in the *Taylor* opinion. The *Parks* opinion states, "But even with a flawed system, if in a given case 'it may be fairly said that the jury lists or panels are representative of the community,' *Taylor,* 419 U.S. at 528, 95 S.Ct. 692 [sic], 95 S.Ct. 692, the Sixth Amendment fair representation requirement is satisfied." *Parks,* 773 F.Supp.2d at 726–27. The full sentence in *Taylor* does not address situations where the minorities are systematically excluded at the level of the jury pool but the venire panel brought in for a particular defendant's jury trial or petit jury drawn from that panel is nonetheless representative of a fair cross section. Instead, the phrase is found in a sentence assuring the states of their remaining power over jury eligibility, and reads in full: "The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." *Taylor,* 419 U.S. at 538, 95 S.Ct. 692.

cross-section guarantee, but the exclusion must be systematic. *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. 664. Systematic means "inherent in the particular jury-selection process utilized." *Id.* at 366, 99 S.Ct. 664.

If a *prima facie* violation is established, the government is required to show that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process ... that result in the disproportionate exclusion of a distinctive group" in order to rebut the presumption. *Duren,* 439 U.S. at 367–68, 99 S.Ct. 664.

### b. Application & Analysis

Dr. Stephenson concluded that the absolute disparity test "result indicates that there is a 6.03 percent difference between the percentage of eligible Black and African Americans in Kent County and the actual percentage in the venire." (Doc. 46 at 54.) Dr. Stephenson further concluded that the comparative disparity test showed that the *Bryant* trial "had 73.1% fewer Black or African American members than could have been expected in Kent County." (*Id.*) Dr. Stephenson suggests that neither the absolute nor comparative disparity tests are "viable for inferential purposes" because they are "not capable of identifying whether this group is statistically significantly underrepresented and small changes in the venire representation will unduly distort the analysis . . . ." (*Id.*)

Using the standard deviation and binomial tests, Dr. Stephenson concluded that there was "insufficient evidence to demonstrate that the representation of Blacks or African Americans *in the venire* is biased, this is in part due to the size of the venire." (*Id.* at 55 (emphasis in original).) After employing the Chi-square Goodness-of-fit test, Dr. Stephenson found that "there is essentially no chance of acquiring the results we obtained if the selection process for potential jurors is unbiased. As a result, there is overwhelming evidence to conclude that the selection process *for terms* during the first months of 2002 was biased." (*Id.* at 56 (emphasis in original).)

Dr. Rothman's analysis similarly concluded that the period between April 2001 and August 2002 revealed significantly more underrepresentation of African Americans than the earlier period studied. (Doc. 46 at 7, 9.) Dr. Rothman found that the absolute disparity between jury-eligible African Americans and those who appeared on jury venires was 3.45% between April 2001 and August 2002. (*Id.* at 1–2.) Dr. Rothman further concluded that the comparative disparity during this time period was 42%. (*Id.* at 2.) [13]

Thus, according to Dr. Stephenson, the relevant absolute disparity was 6.03% and the comparative disparity was 73.1%. According to Dr. Rothman, the relevant absolute disparity was 3.45% and the comparative disparity was 42%. [14] At least one Michigan court has found underrepresentation by using Dr. Stephenson's conclusions regarding a trial held within the same time period in Kent County as the trial in the instant case. *See People v.*

13. Dr. Rothman also concluded that the absolute disparity between jury-eligible African–Americans or Hispanics and those who appeared on venire panels between April 2001 and August 2002 was 4% and that the comparative disparity was 29%. (*Id.*)

14. In *Berghuis v. Smith,* the United States Supreme Court rejected the Sixth Circuit's holding that comparative disparity results be used rather than absolute disparity or standard deviation analyses. Instead, the Court held that "neither *Duren* nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools." *Smith,* 130 S.Ct. at 1393.

*Bryant,* 289 Mich.App. 260, 796 N.W.2d 135 (2010) (underrepresentation shown in Kent County jury selection process in February 2002 using comparative disparity of 73.1% provided by Dr. Stephenson's report) (citing *United States v. Rogers,* 73 F.3d 774, 776–77 (8th Cir.1996) (holding that comparative disparity of more than 30 percent satisfies the second prong of *Duren* )).[15]

Using either Dr. Rothman's or Dr. Stephenson's absolute disparity figures, i.e., 3.45% or 6.03%, Garcia–Dorantes has shown a percentage that exceeds the 3% that courts have recently found to be insufficient proof of underrepresentation. *See United States v. Mujahid,* 433 Fed.Appx. 559, 561 (9th Cir.2011) ("An absolute disparity of 2.87% is insufficient to make a *prima facie* showing of substantial underrepresentation"); *United States v. Rodriguez–Lara,* 421 F.3d 932, 943–44 (9th Cir. 2005) (absolute disparity of 3% is too low to be evidence of underrepresentation and comparing cases finding 14.1% and 15.4% absolute disparity to satisfy second *Duren* prong); *United States v. Royal,* 174 F.3d 1, 10 (1st Cir.1999) (absolute disparity of 2.9% insufficient to show underrepresentation).

However, neither Dr. Stephenson nor Dr. Rothman's figures would support a finding of underrepresentation if the standard requiring over 10% absolute disparity were used, as it has been in other circuits.

*See United States v. Ashley,* 54 F.3d 311, 314 (7th Cir.1995) ("a discrepancy of less than ten percent alone is not enough to demonstrate unfair or unreasonable representation of blacks on the venire"); *United States v. Suttiswad,* 696 F.2d 645, 649 (9th Cir.1982) (7.7% absolute disparity not substantial); *United States v. Grisham,* 63 F.3d 1074, 1078–79 (11th Cir.1995) (absolute disparity of "10 percent or less" does not satisfy the underrepresentation prong). However, the Sixth Circuit has not adopted this position and, thus, I suggest that it is not outcome-determinative here.[16]

If the comparative disparity figures are used, Garcia–Dorantes would be unable to show sufficient underrepresentation using Dr. Rothman's 42% but could find support by using Dr. Stephenson's 73.1% comparative disparity. *See United States v. Weaver,* 267 F.3d 231, 243 (3d Cir.2001) (finding insufficient evidence of underrepresentation where comparative disparity was 40.01% for Blacks and 72.98% for Hispanics and absolute disparity was 1.23% for Blacks and 0.71% for Hispanics); *United States v. Chanthadara,* 230 F.3d 1237, 1257 (10th Cir.2000) (comparative disparity of 40.89% and 58.39% was insufficient evidence of underrepresentation, comparing case which held that 68.22% was sufficient); *United States v. Clifford,* 640 F.2d 150, 155 (8th Cir.1981) (46% comparative disparity was insufficient to show underrepresentation).[17]

**15.** The Michigan Supreme Court has granted leave to appeal. *People v. Bryant,* 489 Mich. 924, 797 N.W.2d 135 (2011).

**16.** I further note that the standard requiring that at least 10% underrepresentation be shown derives from a case that predates *Duren,* and does not discuss any statistical analysis. *See Swain v. Alabama,* 380 U.S. 202, 209, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). I therefore suggest that its current applicability is dubious.

**17.** I note that Respondent's reliance on *United States v. Buchanan,* 213 F.3d 302, 310 (6th Cir.2000), is misplaced. As Respondent noted, the Sixth Circuit did not calculate the absolute or comparative disparities. (Doc. 48 at 26.) More importantly, however, the Court's holding did not rest on its underrepresentation finding. Instead, the Court held that "even if statistics could be viewed as underrepresentative, the defendants did not present any evidence of 'systematic exclusion.'"

Viewing the evidence in the light most favorable to Garcia–Dorantes, I suggest that the evidence is sufficient to support *Duren's* underrepresentation prong. As to systematic exclusion, I suggest that the instant case presents a more obvious example of exclusion "inherent in the particular jury-selection process utilized" than that in *Smith. Duren,* 439 U.S. at 366, 368 n. 26, 99 S.Ct. 664. The evidence reveals that the exclusion was due to the confluence between entry of an erroneous population parameter, which understated the county population by 3.8 times, and the fact that the state file listed names in zip code order, from lowest to highest, where the lower zip codes represent areas outside the Grand Rapids metro area which have a much smaller African American population. (Doc. 46 at 137–38.) Although the genesis of the erroneous population parameter remains unknown, I suggest that the parameter itself is systematic and inherent in the selection process. *See United States v. Jackman,* 46 F.3d 1240, 1242–43 (2d Cir.1995) (recalling original systematic exclusion whereby jury questionnaires were not sent to Hartford residents because a computer programming error had caused the letter 'd' in 'Hartford' to communicate to the computer that all potential jurors from Hartford were deceased and thus unavailable for jury service).[18] I further suggest that the file given from the State of Michigan to the county, which listed potential jurors in order of zip code, is also systematic and inherent in the process.

Accordingly, I suggest that Garcia–Dorantes has presented sufficient evidence to establish a *prima facie* case of underrepresentation in violation of the Sixth Amendment's fair-cross-section requirement. Since the government has not attempted to establish that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process," I suggest that the *prima facie* case has not been rebutted. *Duren,* 439 U.S. at 367–68, 99 S.Ct. 664. I therefore recommend that claim six of Garcia–Dorantes' habeas petition be granted.

### III. *REVIEW*

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed.R.Civ.P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty,* 454 F.3d 590, 596 (6th Cir.2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir.2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have

---

**18.** The case analyzed a later plan which allowed the jury clerk to omit certain names from the "picking list," e.g., names of jurors who had served the previous month. *Id.* at 1243. If the jury clerk did not have enough names on the "picking list," then the clerk would supplement that list with additional names from the new qualified wheel that included Hartford and New Britain. *Id.* at 1244. The court held that defendant established his *prima facie* case and that the government failed to rebut his showing. *Id.* at 1248.

to this Report and Recommendation. *McClanahan v. Commissioner of Soc. Sec.,* 474 F.3d 830, 837 (6th Cir.2006); *Frontier Ins. Co.,* 454 F.3d at 596–97.

Dated: January 5, 2012.

